**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| David Steele Douglass, | No. CV-17-04686-PHX-SMB |
|---|---|
| Plaintiff, | **ORDER** |
| v. | |
| City of Mesa, et al., | |
| Defendants. | |

Before the Court is Defendants' Motion for Summary Judgement,[1] (Doc. 34, "Mot."). Plaintiff David Steele Douglass responded, (Doc. 37, "Resp."), and Defendants replied, (Doc. 37, "Reply"). Each party submitted a separate statement of facts. (Docs. 35, 38.) Neither party requested oral argument and the Court finds that the Motion can be resolved without it. LRCiv 7.2(f). Defendants' Motion will be granted in full.

## I. BACKGROUND

On September 6, 2016, City of Mesa ("City") police officers and building inspectors executed a validly authorized search warrant at Plaintiff's house in Mesa, Arizona.[2] (*See* Doc. 35-1 at 2-5; Doc. 35-2 at 2-4; Doc. 35-15 at 2.) Upon entering the house, Defendant McKnight, a City police detective, noticed "exposed wires in and out of the residence and a collapsing roof in the kitchen." (Doc. 35-15 at 2.) To safely continue with the search,

---

[1] Defendants include the City of Mesa, Clyde Spillers, Steven Hether, Brett Metcalf, Thomas McKnight, and Jose Rodriguez.
[2] Detective McKnight obtained the warrant for Plaintiff's house from Maricopa County Superior Court earlier that day by attesting to, *inter alia*, numerous reports of drug trafficking activity by Adrian Biggs, another person residing there. (Doc. 35-1 at 2-5; Doc. 35-2 at 2-4; Doc. 35-15 at 2.)

McKnight asked Defendant Spillers, a City building inspector, to assist in identifying and helping officers avoid dangerous conditions. (*Id.*; Doc. 35-13 at 2; Doc. 35-14 at 2.) Spillers and Jose Balderrama, another City building inspector who is a non-party in this case, agreed to come. (Doc. 35-13 at 2; Doc. 35-14 at 2.) This was not the first time that the City's police department enlisted City building inspectors' help after observing unsafe conditions while executing a search warrant. (*See* Doc. 38-3 at 5, 7.) In fact, the two groups have discussed how to better cooperate over time and the police department even circulated an interoffice memo on April 12, 2017 listing temporary guidelines for determining whether a structure being searched can be deemed unsafe. (*See id.* at 9-18, 21-36.) As it relates to this case, however, McKnight attests that the search warrant was safely executed because of Spillers' assistance. (Doc. 35-15 at 3.)

In addition to ensuring the search warrant was safely executed, Spillers and Balderrama also identified five "imminent life safety hazards":

(1) Means of emergency egress blocked by debris in bedrooms
(2) Interior electrical, exposed conductors
(3) Roof leaks, dry rot and water damage to ceilings
(4) Non permitted patio enclosure, walls have dry rot
(5) Relocated water heater to exterior, no cover and water heater not listed for exterior use.

(Doc. 35-8 at 2; Doc. 35-13 at 2.) Because of the safety issues in Plaintiff's house, Spillers posted notices on it sometime after the search indicating it was unsafe to occupy and no one should enter. (Doc. 35-13 at 2-3; Doc. 35-14 at 2-3.)

Seven days after posting the notices, Defendant Hether, the City's Deputy Director of Developmental Services and a Building Official, sent Plaintiff a letter concerning his home's deficiencies. (Doc. 35-8 at 2-3.) Spillers and Balderrama delivered the letter to Plaintiff. (Doc. 35-13 at 3; Doc. 35-14 at 2.) The letter informed him that "[his house] has been deemed unsafe by the Building Official for the City of Mesa" and "shall be vacated" "[g]iven the imminent life and fire safety issues found" during the "initial site inspection on 9/6/2016." (Doc. 35-8 at 2.) Hether's letter also explained that Plaintiff could appeal the

City's determination to the Building Board of Appeals within thirty days of receiving it.[3] (Doc. 35-8 at 3.) Plaintiff acted on this information and timely appealed the City's determination on October 10, 2016, (Doc. 35-9 at 2), but later withdrew the appeal after repairing and reoccupying his home, (Doc. 35-11 at 2).

With his home deemed unsafe, Plaintiff was forced to live elsewhere. The incident traumatized him. In July 2018, he obtained a "psychological evaluation to determine if there are any mental health issues" by Dr. John Toma. (Doc. 38-1 at 1-10.) Dr. Toma concluded that Plaintiff should receive psychotherapy for his depression and anxiety in partial remission. (*Id.* at 8-10.) However, he also concluded that Plaintiff's "residual symptoms of depression and anxiety . . . were not disabling" even though "[he] experienced a full episode of depression . . . [and] is still experiencing symptoms almost two years later." (*Id.* at 7, 9-10.) Plaintiff is not currently undergoing psychotherapy and has not been previously treated.

About ten months after reoccupying his house, Plaintiff brought this action in Maricopa County Superior Court before Defendants removed it to this Court. (*See* Doc. 1.) His Complaint alleges five counts against Defendants under various constitutional and common law theories. (*Id.* at 13-20.) The counts include: (1) Fourth and Fifth Amendment claims; (2) intentional, reckless, or negligent infliction of emotion distress claims; and (3) a negligent hiring, retention, supervision, and training claim.[4] (*Id.*) Defendants move for summary judgment on all claims.

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is any factual issue that might affect the outcome of the case under

---

[3] The parties dispute whether Spillers' identified conditions in Plaintiff's house were dangerous or not. In fact, about two years after Hether deemed Plaintiff's house unsafe to occupy and after Plaintiff reoccupied it, the Rieser Building Group inspected it and concluded "that the claim of [the house] having imminent life safety issues has no merit." (Doc. 38-2 at 33.).

[4] Plaintiff lists the Eighth and Fourteenth Amendments on one page in his Complaint, but omits any mention of either in his response. (*See* Doc. 1 at 14.) These claims are forfeited.

the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). The Court need only consider the cited materials, but it may also consider any other materials in the record. *Id.* 56(c)(3). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of demonstrating to the Court the basis for the motion and "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id*. If the movant fails to carry its initial burden, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). If the movant meets its initial responsibility, the burden then shifts to the nonmovant to establish the existence of a genuine issue of material fact. *Id.* at 1103. The nonmovant need not establish a material issue of fact conclusively in its favor, but it "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmovant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 247–48. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted). However, in the summary judgment context, the Court believes the nonmovant's evidence, *id.* at 255, and construes all disputed facts in the light most favorable to the nonmoving party, *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("facts must be viewed in the light most favorable to the non-moving party *only* if there is a 'genuine'

dispute as to those facts" (emphasis added) (citation omitted)). If "the evidence yields conflicting inferences [regarding material facts], summary judgment is improper, and the action must proceed to trial." *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002).

### III. DISCUSSION
#### A. Defendants Are Not Liable Under Section 1983.

The Complaint alleges Fourth and Fifth Amendment violations against Defendants under 42 U.S.C. § 1983. (Doc. 1 at 13-14, 18-19.) Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. However, the section "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Thus, "one cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything." *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979). Rather, a section 1983 plaintiff must show four things: "(1) a violation of rights protected by the Constitution or created by federal statute, (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Because municipal liability under section 1983 differs from individual liability, the Court separately addresses the City's liability. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

#### 1. The City Is Not Liable Under Section 1983 Because Plaintiff Identifies No Policy or Custom That Caused His Injuries.

The Complaint alleges that the City violated Plaintiff's Fourth and Fifth

Amendment rights. (Doc. 1 at 13-14, 18-19.) Defendants argue summary judgment is appropriate because Plaintiff fails to identify a municipal policy or custom as required by *Monell*. (Mot. at 4-5.) The Court agrees with Defendants.

It is well-settled that "municipalities and other local government units . . . [are] included among those persons to whom § 1983 applies." *Monell*, 436 U.S. at 690. However, "a municipality cannot be held *solely* liable because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under a *respondeat superior* theory." *Id.* at 691. Nor is it "enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997). Even "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985). Instead, "to establish municipal liability, a plaintiff must show that a 'policy or custom' led to the plaintiff's injury." *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir. 2016) (en banc), *cert. denied*, *Los Angeles Cty., Cal. v. Castro*, 137 S. Ct. 831 (2017) (quoting *Monnell*, 436 U.S. at 694). "The [Supreme] Court has further required that the plaintiff demonstrate that the policy or custom of a municipality 'reflects deliberate indifference to the constitutional rights of its inhabitants.'" *Castro*, 833 F.3d at 1060 (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)).

Plaintiff's section 1983 claims against the City fail because he identifies no municipal policy or custom that caused his injuries. *See Monnell*, 436 U.S. at 691. Rather than identify a policy or custom, Plaintiff merely assumes Hether is a policymaker, and that the letter indicating his home was unsafe is a "single action taken by a municipal policymaker . . . to impose liability." (*See* Resp. at 1 (citing *City of Oklahoma City*, 471 U.S. at 821)). However, Plaintiff provides no evidence showing Hether is a policymaker or that his isolated decision rendering Plaintiff's house unsafe based on its unique deficiencies is a municipal policy or custom. *See Collins v. City of San Diego*, 841 F.2d

337, 341 (9th Cir. 1988) ("municipal liability attaches only when the decisionmaker possesses 'final authority' to establish municipal policy with respect to the action ordered") (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). In fact, Plaintiff even indicates his *own* uncertainty concerning whether Hether is a policymaker. *See* Resp. at 2 ("It would be best to depose defendant Hether to delve deeper into his policy-making role."). Even further, Plaintiff provides no evidence connecting Defendant Hether's decision to a City policy or custom. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.").

Instead of identifying a municipal policy or custom, it appears that Plaintiff wants to hold the City liable for simply empowering Defendant Hether's decision-making, which is clearly insufficient for municipal liability purposes. *See Brown*, 520 U.S. at 405 ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."). "If the mere exercise of discretion by an employee [like here] could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability." *Cf. City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988). Accordingly, the City is entitled to summary judgment on Plaintiff's Fourth and Fifth Amendment claims.

### 2. Qualified Immunity Shields the Individual Defendants from Liability.

As a preliminary matter, Plaintiff omits the capacity in which he is suing the individual Defendants under section 1983. (*See* Doc. 1 at 5-20.) However, because official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent," *Monell*, 436 U.S. at 690 n.55, and municipal liability is unwarranted here, the Court gives Plaintiff the benefit of the doubt and treats the remaining individuals as being sued in their individual capacities, *Kentucky v. Graham*, 473 U.S. 159,

167 n.14 (1985).

Thus, "to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (quoting *Graham*, 473 U.S. at 166). However, "[w]hile the plaintiff in a personal-capacity suit need not establish a connection to a governmental 'policy or custom,' officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law." *Hafer*, 502 U.S. at 25 (citation omitted); *see also Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 965 (9th Cir. 2010) ("Qualified immunity . . . is a defense available only to government officials sued in their individual capacities."). "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S.Ct. 548, 551 (2017) (*per curiam*) (internal quotation marks and citation omitted). "Qualified immunity is an affirmative defense that the government has the burden of pleading and proving." *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir 2017) (citation omitted). If applied properly, qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Hernandez v. City of San Jose*, 897 F.3d 1125, 1132-33 (9th Cir. 2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

"Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case.'" *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) (internal quotation marks and citation omitted); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001). Judges may "decid[e] which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Complaint alleges Defendants Spillers, Hether, Metcalf, Rodriguez, and

McKnight, *en masse*, violated Plaintiff's Fourth and Fifth Amendment rights. (Doc. 1 at 13-14, 18-19.) As explained below, Plaintiff marginally supports these allegations in his response. Defendants argue they cannot be vicariously liable for each other's conduct and also that they did not individually violate Plaintiff's constitutional rights; but even if they did, that qualified immunity is still appropriate because their conduct did not violate clearly established law. (Mot. at 5- 6.) The Court finds qualified immunity appropriate here. That is, no evidence supports a constitutional violation by any Defendant. Furthermore, even assuming Defendants violated Plaintiff's constitutional rights, Plaintiff highlights no clearly established law prohibiting each Defendant's conduct.

### a. No Evidence Supports A Constitutional Violation.

Under the first prong of the qualified immunity inquiry, the Court considers whether the facts "[t]aken in the light most favorable to the party asserting the injury . . . show [that] the [defendant's] conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201. "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "Sweeping conclusory allegations will not suffice to prevent summary judgment. The [plaintiff] must set forth specific facts as to each individual defendant's" role in each alleged constitutional deprivation. *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988). Because no evidence supports a constitutional violation, Defendants are entitled to qualified immunity. *Ioane v. Hodges*, 939 F.3d 945, 950 (9th Cir. 2018) ("If there is no constitutional violation, the inquiry ends and the officer is entitled to qualified immunity." (citing *Saucier*, 533 U.S. at 201)).

### i. No Fourth Amendment Violation.

Plaintiff baldly claims that Defendants, apparently as a group, violated the Fourth Amendment.[5] (*See* Resp. at 6 ("The validity of the search is not in question but the

---

[5] The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be

- 9 -

reasonableness of the conduct of the defendants.")). In explaining this argument, he claims that building inspectors may only assist in search warrants when structures are already unsafe, (*id.* ("Plaintiff agrees that a code compliance officer can aid the police, if the facts require it. The facts here did not require it. The structure was not unsafe.")), and further suggests that "[w]hile inspectors can assist the police in a search, they cannot conspire with the police to create the aura of unsafe conditions," (*Id.* at 7). In an attempt to support these claims, Plaintiff cites to only *Hunter v. Bryant*, 502 U.S. 224, 228-29 (1991) (*per curiam*) for the proposition that Defendants, "were mistaken about the conditions [in his house] being dangerous" and that their "mistake was unreasonable." (*Id.* at 4.)

Plaintiff's hollow and unsupported conclusions do not establish a Fourth Amendment violation by any Defendant. In fact, he concedes that Defendants had probable cause and a valid search warrant and does not argue that they exceeded the warrant's scope.[6] (*Id.* at 6.) This is a powerful concession. *See Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) ("Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner." (citation omitted)). Moreover, even assuming Defendants mistakenly deemed Plaintiff's home unsafe, such a mistake would not displace their entitlement to qualified immunity. *See Pearson*, 555 U.S. at 231 ("The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." (internal quotation marks and citations omitted)). Lastly, no evidence shows any Defendant conspired against him to deem his house unsafe.[7]

---

searched, and the persons or things to be seized." U.S. Const. Amend. IV.
[6] No evidence shows Hether or Metcalf even assisted in the search.
[7] Relatedly, and contrary to Plaintiff's suggestion, no evidence supports an unreasonable Fourth Amendment seizure by Defendants either. Plaintiff appears to argue Defendants' seizure of his house was unreasonable because it was improperly found unsafe. (*See* Resp. at 10-11.) Even assuming Defendants improperly deemed his house as unsafe, Plaintiff cites no authority for the proposition that such an erroneous finding would make the seizure per se unreasonable. Indeed, the opposite appears true. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated

In short, no evidence supports a Fourth Amendment violation by any Defendant. The limited evidence before the Court shows a validly authorized search warrant that Plaintiff concedes was issued on probable cause. Plaintiff's challenges concerning whether his house was improperly deemed unsafe or that Defendants conspired to evict him from his home lack legal and factual support for a Fourth Amendment claim. Thus, each Defendant is entitled to qualified immunity on these claims. *Ioane*, 903 F.3d at 933.

### ii. No Fifth Amendment Violation.

The Complaint also alleges a procedural due process and taking claim under the Fifth Amendment against Spillers and Hether.[8] (Doc. 1 at 18-19.) No evidence supports either and both individuals are entitled to qualified immunity on these claims too.

### 1. No Procedural Due Process Violation.

Plaintiff's Complaint alleges Hether and Spillers "violated the notice requirements of the Mesa City Code, the Arizona Constitution, and of the Fifth Amendment depriving plaintiff of his right to due process." (Doc. 1 at 18.) It further alleges Defendants "failed to give [him] notice of the code violations and the opportunity to correct them," but also alleges the notice they gave was "tardy." (*Id.* at 18-19.)

However, despite these allegations, Plaintiff states in his response that "[he] does not argue 'that he was entitled to a hearing before entry was restricted.'" (*Id.* at 9.) He further argues that "Defendants' point that [he] was properly excluded from his house because the Mesa city code provided for a hearing and he had notice that he was excluded from the house and the opportunity to contest his exclusion from the house at a hearing, *all of which conforms with due process of law*, is beside the point." (*Id.* at 7) (emphasis added). He further claims that "*Mathews v. Eldridge*, 424 U.S. 319 (1976), cited by defendants, is

---

that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable."); *see also Pearson*, 555 U.S. at 231 (same).
[8] It also alleges a procedural due process claim under Arizona's Constitution. (*Id.*) However, section 1983 does not provide a cognizable cause of action for vindicating violations of state constitutional rights. *Ybarra v. Bastian*, 647 F.2d 891, 892 (9th Cir. 1981). "Thus, asserting claims under the Arizona Constitution does not state a claim under § 1983." *Reyes-Reyes v. Hughes*, No. CV 12-1684-PHX-DGC (MEA), 2012 WL 4008948, at *3 (D. Ariz. Sept. 12, 2012).

nothing to the point." (*Id.*) Defendants argue that Plaintiff's procedural due process claims fail "[b]ecause the City provided multiple notices to Plaintiff regarding the dangerous conditions, and because the City provided a method for Plaintiff to appeal the City's determination." (Mot. at 11.)

The Court finds no procedural due process claim because Plaintiff had a post-deprivation remedy available to him. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("[W]e hold that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause . . . if a meaningful postdeprivation remedy for the loss is available."). Hether's notice explicitly outlined Plaintiff's opportunity to appeal the City's determination that his house was unsafe. In fact, Plaintiff exercised his post-deprivation remedy and timely appealed Hether's decision. Due process was certainly met under these circumstances. *See Mathews*, 424 U.S. at 333 ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (internal quotation marks and citation omitted)).

Plaintiff instead argues "that there was no objectively reasonably [sic] evidence that the conditions listed were unsafe or that the house was generally unsafe to inhabit, and therefore the city had no authority to bar him from his house." (Resp. at 9.) In effect, he argues Defendants violated due process by incorrectly deeming his house unsafe. (*Id.* at 8-9.) In support, he cites to the Rieser Group's report, which concluded his home was erroneously deemed unsafe. (*See* Doc. 38-2 at 1-44.) However, even accepting this conclusion as true, it does not support a due process violation. Regardless of whether his house was safe, Plaintiff was afforded an opportunity to be heard regarding the City's determination on appeal and even opted in to such a hearing as stated above. Even assuming the City's noncompliance with its building code, the alleged due process violation is unsupported in light of his meaningful post-deprivation remedies. *See Power Rd.-Williams Field LLC v. Gilbert*, 14 F. Supp. 3d 1304, 1312 (D. Ariz. 2014) ("It is the Due Process Clause, not state law, which determines what process is due.") (citing *Halverson v. Skagit*

*Cty.*, 42 F.3d 1257, 1260 (9th Cir. 1994)).

Accordingly, Defendants Hether and Spillers are entitled to qualified immunity because no evidence supports a Fifth Amendment due process deprivation.

### 2. **No Taking Violation.**

The Complaint alleges that Hether and Spillers "willfully deprived plaintiff of the use of his property without compensation" under the Fifth Amendment, (Doc. 1 at 19), but does not indicate which type of taking he is claiming. *See Valencia Kolb Props. v. Pima Cty.*, No. CV-13-1319-TUC-DCB, 2014 WL 12575855, at *4 (D. Ariz. Nov. 6, 2014) (discussing the different types of takings). In any event, Plaintiff abandons this claim in his response, where he states: "While at first glance it may be supposed that this action is simply a Fifth Amendment takings claim, it is essentially a Fourth Amendment claim." (Resp. at 10.) He also states in his response: "A Fifth Amendment taking is not what this case is about." (*Id.* at 11.) Defendants argue that Plaintiff was only temporarily deprived of his house and therefore did not effect a taking. (Mot. at 15-16.)

Even disregarding Plaintiff's concessions that this case is not about a Fifth Amendment taking, Defendants' conduct of temporarily barring him from his home did not result in one. *See Hoeck v. City of Portland*, 57 F.3d 781, 787 (9th Cir. 1995) ("An otherwise valid exercise of the police power constitutes a taking for which compensation is due if the owner suffers a permanent, physical occupation of the property." (citations omitted)). Plaintiff suffered no permanent, physical occupation of his property. Rather, he was permitted to reoccupy his home after repairing it. *See id.* at 787 ("[When] the state . . . enter[s] property to enforce a valid land-use regulation and destroy the offending property[,] [t]his does not amount to a physical occupation even where the government's activity has a permanent effect."). In fact, "the government effects a physical taking only when it *requires* the land owner to submit to the physical occupation of his land." *Yee v. City of Escondito*, 503 U.S. 519, 527 (1992). "Because the City's presence was temporary, . . . [Plaintiff] has suffered no permanent physical invasion of his ownership interest in his property." *Cf. Hoeck*, 57 F.3d at 788. Accordingly, Defendants are entitled to qualified

immunity on this claim.

### b. Defendants Did Not Violate Clearly Established Law.

"[T]he 'clearly established' inquiry is a question of law that only a judge can decide." *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017). While "a case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (*per curiam*) (quoting *al–Kidd*, 563 U.S. at 741). The Court must not "define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (9th Cir. 2018) (*per curiam*). "Rather, the clearly established law at issue 'must be particularized to the facts of the case.'" *Foster v. City of Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018) (*per curiam*) (quoting *White*, 137 S. Ct. at 551). To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what [the official] is doing violates that right." *Anderson*, 483 U.S. at 640. The "high standard is intended to give officers breathing room to make reasonable but mistaken judgments about open legal questions." *Ioane*, 903 F.3d at 937 (internal quotation marks and citation omitted). While "general statements of the law are not inherently incapable of giving fair and clear warning to officers," courts may not deny qualified immunity by simply stating "that an officer may not use unreasonable and excessive force." *Id.* The Court must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 136 S. Ct. at 308 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (*per curiam*)).

Even assuming a particular Defendant violated Plaintiff's constitutional rights, Plaintiff fails to show that such conduct was prohibited by clearly established law. *Saucier*, 533 U.S. at 201; *see Torres v. Goddard*, 194 F.Supp.3d 886, 891 (D. Ariz. 2016) ("Regarding the clearly established prong, the burden is on the Plaintiff[] to show that the law was clearly established at the time of the alleged violation." (citing *Davis v. Scherer*, 468 U.S. 183, 197-98 (1984))). Plaintiff fails to meet this burden. He barely even identifies the alleged conduct of each individual Defendant that he believes violates the Fourth or

Fifth Amendment, let alone point to a case prohibiting it. *See Pearson*, 555 U.S. at 223 (noting that applying the two prongs of the qualified immunity inquiry in sequential order is sometimes unworkable because "lower courts sometimes encounter cases in which the briefing of constitutional questions is woefully inadequate."). Thus, Defendants are independently entitled qualified immunity under this prong even if a constitutional violation occurred.

### B. No Evidence Supports an Intentional, Reckless, or Negligent Infliction of Emotional Distress Claim.

The Complaint alleges this claim against each Defendant. (Doc. 1 at 15-16.) To survive summary judgment on his intentional infliction of emotion distress ("IIED") claims, Plaintiff must show that: (1) each defendant's conduct was "extreme and outrageous"; (2) each defendant intended to cause emotional distress or recklessly disregarded the high certainty that his conduct would cause such distress; and (3) each defendant's conduct actually inflicted severe emotional distress. *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 746 (9th Cir. 2004); *Ford v. Revlon*, 734 P.2d 580, 585 (1987). Plaintiff fails to make the first showing.

At the outset, Plaintiff unpersuasively argues that "a jury should be given the chance to determine whether defendants' conduct was outrageous," (Resp. at 12 (citing *Lucchesi v. Stimmell*, 716 P.2d 1013, 1017 (Ariz. 1986)), because "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Watts v. Golden Age Nursing Home*, 619 P.2d 1032, 1035 (1980). In fact, "[s]ummary judgment is only inappropriate 'when reasonable minds could differ in determining whether conduct is sufficiently extreme or outrageous.'" *Bodett*, 366 F.3d at 747 (quoting *Mintz v. Bell Atl. Sys. Leasing, Int'l, Inc.*, 905 P.2d 559, 563 (1995)). For conduct to be sufficiently extreme and outrageous, it must be "'so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Rayes v. United States*, 967 F.Supp. 1162, 1165 (D. Ariz. 1997) (quoting *Mintz*, 905 P.2d at 563). Defendants' conduct was not extreme and outrageous.

In fact, Plaintiff identifies no extreme and outrageous conduct by *any* Defendant. Although the Complaint alleges that Defendants' unspecified conduct was extreme and outrageous, (*see* Doc. 1 at 16), Plaintiff fails to bolster such allegations with any evidence. He instead baldly concludes that when "a code-compliance officer bars an occupant from his home for specious reasons with severe consequential damages, he has acted outrageously and is liable for the tort of intentional infliction of emotional distress." (Resp. at 12.) However, this unsupported conclusion does not show extreme and outrageous conduct. It barely even identifies what occurred. Declaring conduct is extreme and outrageous is one thing; supporting it is another. *See Johnson v. Impala Bob's Inc.*, No. CV-04-2753-PHX-SRB, 2007 WL 9724871, at *17 (D. Ariz. Mar. 23, 2007). Instead of showing outrageous and extreme conduct, the evidence shows that Plaintiff was prohibited from entering his home because five defects made its occupancy unsafe. Surely, attempting to protect an individual from residing in an unsafe home is not extreme and outrageous conduct even if the house were erroneously found unsafe. No reasonable juror could find such protection so "outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Cf. Ford*, 734 P.2d at 585. Without evidence of outrageous and extreme conduct, Defendants are entitled to summary judgment on this claim. *See Johnson*, 2007 WL 9724871, at *17-18 ("Here, the facts simply do not fall into that rare category of claims that meet the standard for an IIED claim. Therefore, Defendants are entitled to summary judgment on this claim.").

Relatedly, Plaintiff's negligent infliction of emotional distress fails because he presents no evidence of a physical injury.[9] *See Rayes*, 967 F.Supp. at 1165. "Absent a physical injury, Arizona law does not recognize a cause of action for negligent infliction of emotional distress." *Id.* (citing *Gau v. Smitty's Super Valu, Inc.*, 901 P.2d 455, 457 (App. 1995)); *see also HM Hotel Props. v. Peerless Indem. Ins. Co.*, 874 F.Supp.2d 850, 853 (D.

---

[9] Reckless infliction of emotional distress is not cognizable under Arizona law. *See Willis v. Walgreen Co.*, No. 3:10-CV-08258 JWS, 2011 WL 772721, at *1 n.1 (D. Ariz. Feb. 28, 2011) ("Because there is no such claim under Arizona law, . . . the court will treat plaintiff's 'reckless' infliction of emotional distress claim as a claim for negligent infliction of emotional distress."). The Court does likewise here.

Ariz. 2012) ("Negligent infliction of emotional distress requires an additional showing of physical injury or substantial, long-term emotional disturbances." (internal quotation marks and citation omitted)). Accordingly, Defendants are entitled to summary judgment on Plaintiff's negligent infliction of emotional distress claims.

Plaintiff's "reckless infliction of emotional distress" claims, as noted above, are not cognizable under Arizona law. Lastly, because the Court finds no underlying tort by any Defendant, the City cannot be vicariously liable.

### C. No Evidence Supports a Negligent Hiring, Retention, Supervision, and Training Claim Against the City.

Instead of supporting this claim, Plaintiff abandons it. (*See* Resp. at 12.) In his response, he states "[t]hus far discovery has not uncovered facts which would support plaintiff[']s negligent hiring, retention, supervision and training claims." (*Id.*) As Defendants correctly claim: "Plaintiff concedes that he has no evidence to support this claim." (Repl. at 11.) Accordingly, the City is entitled to summary judgment here.

### IV. CONCLUSION

Plaintiff's claims against each Defendant do not withstand summary judgment. He identifies no policy or custom to impose municipal liability against the City for any constitutional violation. Moreover, the individual Defendants are entitled to qualified immunity on the constitutional claims because they did not act unconstitutionally, and even assuming they did, Plaintiff highlights no clearly established law that any single Defendant violated. Lastly, Plaintiff provides no evidence to support his emotional distress claims and abandons his negligent hiring, retention, supervision, and training claim.

///
///
///
///
///

**IT IS ORDERED** that Defendants' Motion for Summary Judgment, (Doc. 34), is **GRANTED**;

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment in favor of Defendants and terminate this case.

Dated this 3rd day of March, 2020.

Honorable Susan M. Brnovich
United States District Judge